And we'll move on to the next case. With thanks to all counsel. The next case today is United States against Karen Zais and Andrew Nelson appeals 16 dash 4066 and 16 dash 4174. And it will be Mr. Ruth first. Please the court. My name is Rob Ruth. I represent the defendant appellant. Andrew Nelson and I actually will be presenting the oral argument for both appellants in this case. The issue, your honor, is does the dangerous weapon enhancement under 2D1.1B apply in the situation of unloaded hunting rifles found near where drugs were stored and sold when there's no ammunition in the house? It's unusual for a hunter, isn't it? I don't think it is. I'm an avid hunter, your honor, and I don't always have ammunition. You know, it wasn't hunting season. So if it's hunting season and you plan to go hunting tomorrow, sure, it would be unusual that there's no ammunition. But it's a fact. There's no ammunition available. And that takes away the dangerousness of a weapon when you don't have ammunition. Well, they had surveillance in four directions. You're right. And out in the sticks where they lived, they probably pretty much knew a lot of who their customers were coming and going. I believe that they knew all of their customers. I think it was by invitation only. So it's only those guns there would be for someone they didn't know. Well, you know what? I think that what you're proposing is a theoretical or abstract possibility. Well, it would scare away the bad guys if they were just thinking about maybe robbing the place. But they see these guns there, they know that these people probably have to know what to do with them. Except that you've already were correct when you said that they knew their customers. They knew who was coming to the house. It was all people they knew. It wasn't a situation where just people off the street showed up. It was only by invitation. But even with that, two things, two points I'd like to make about that. First of all, that was a finding that the district court made with respect to Ms. Zeiss. Not on the record at the hearing, but it was included in her statement of reasons. But it wasn't a finding at any point in the context of Mr. Nelson. It's kind of a strange situation. I think that quite frankly it's a situation of the court sort of correcting itself. It didn't say that I'm correcting myself. But the sentences were two different hearings. Ms. Zeiss had her sentencing hearing and this issue was litigated. Weeks later, Mr. Nelson had his sentencing hearing and the issue was litigated again. They got different sentences, didn't they? Pardon? Didn't they get different sentences? They did get different sentences. Okay. Why did she get more? Well, the sentence was basically driven by the reduction that occurred as the result of their substantial assistance. And my humble opinion about why she got more is that Mr. Nelson had a...this was my argument to the judge and I think he accepted it. Mr. Nelson lost about $150,000 in property in the context of a forfeiture. He was the rightful owner of that house. It was passed down through his family. It was 150 acres plus a house and that got split in half. He lost half of that. And my argument to the judge was you have to give him...that's punishment and you have to adjust his sentence accordingly. And I think he accepted it and he did. So he did get a lesser sentence. But the district judge said, look it, the guns at Zeiss's...not at Zeiss's sentencing but in the statement of reasons for Zeiss, he said, the mere presence is an implicit threat. And so you lose on that. But he corrected himself without saying I'm correcting myself. But that wasn't something that he said in the context of Mr. Nelson's sentencing. Did you attack that finding in Nelson's sentencing hearing? I assume everybody was very familiar with the Zeiss sentencing. I mean, I was there and I know the government was there. It honestly never came up. Because recall, at Zeiss's, it didn't come up at Zeiss's sentencing either. It was incorporated in her statement of reasons. It never came up. There's nothing improper about that, is there? I don't think so. I don't know. I think that...but look, even if you say there's this implicit threat and the judge didn't make that finding in Nelson's case, but let's just...okay, there's an implicit threat. What we have to do is, first of all, we have to look at the record. Was there ever anyone who said they were threatened or said they saw the guns or felt intimidated? No, there's nothing like that. But the other thing you have to do is look at the application note. It sets a benchmark for us. The application note says that as an example, what is clearly improbable that it was connected with a drug offense is unloaded hunting rifle in a closet. That's our benchmark. So anything that we have...and the judge looked at that and it was a close call for him. He said, wow, this is really close to that, but you weren't in a closet. But that example isn't meant as these are elements that you have to meet. No, of course not. And he didn't think that either. I honestly think that his big hang-up was the closet, the closet. As opposed to being at the doorway to the drug room. Well, actually behind the doorway. Yeah, behind the doorway. And quite frankly, he said, that's a terrible place to put the guns if you intend to defend the place. He did say that at Zeis' sentencing. But look at our benchmark. Unloaded hunting rifles in a closet. Okay, so look at unloaded hunting rifle in a closet. That could be used. You could grab it and out of the closet, you just open the door and grab it and go shoot the person. So it isn't like we have to show that it's impossible. We're just talking about improbable. And the note says, that's improbable. That's our benchmark. So now apply that to our case. We have unloaded hunting rifles. We have them...and everyone agrees they're hunting rifles and they're unloaded. They're not in a closet. But there's no ammo in the house. So a rifle without ammunition available is not a dangerous weapon. It's not a tool that can be used to defend a drug organization. So that's the practical reality of this case. There's no ammo available. They can't be used to defend a drug organization. They were never used to defend a drug organization. And all we have are these theoretical possibilities. And the note tells us though, look it, there's a benchmark. The benchmark is, if it's as improbable as this, that's improbable enough. And quite frankly, at this point, I think essentially with the district court, if you accept the district court's finding, when you're talking about where there's not even ammo available, if you accept that finding, you're saying if the guns are in close proximity, there is no exception. That's not just presumptive. It's definitive. Close proximity, you lose. And that's not the law. You lose if the district judge is convinced. If he's against you. You're not suggesting he was unfair to you. I mean, I don't, no, no, no. I mean, I just think that, I think that. What's our standard of review here, Mr. Ruth? Clear air. Clear air. And so where the, I think he's wrong on the law. I think he's right on the facts and wrong on the law. And his mistake on the law is he reads the note too literally. He says unloaded, hunting, check, check, in a closet. Oop, they weren't in a closet, you lose. That's too literal. It's a benchmark. It's, okay, how probable is it that an unloaded hunting rifle in a closet would be used to defend a drug organization? That's what we have. And then you look at the probability in our case and say, is it more or less than that? And he didn't do that. He just did it as a checklist. He said they're unloaded, they're hunting, but they're not in a closet, you lose. And that's where he's wrong on the law. I'll reserve the rest of my time for rebuttal. Thank you very much, Mr. Ruth. And Mr. Graber. Good morning, Your Honor. My name is Dan Graber. I was the AUSA that handled the case down below. First of all, with regards to counsel's argument, as the court pointed out, it's a clear error standard of review. The court did not commit any clear error in the findings that there was a nexus in this case between the firearm and the drug offense. As the court pointed out, it was in close proximity to a drug room. Out of the entire house, the one place that three firearms were found, three rifles, was downstairs in the drug room, the one room that was used exclusively to store large quantities of drugs, use drugs, and sell the drugs. This was a room that had the monitors up there with six surveillance cameras on the outside, and four live feeds on the inside to see what was going on. The one long gun with a scope was in the door jamb. As you were walking, as if you were going to go outside and go up the stairs to go outside to service the customer, where the cameras were pointing, that was where the first long gun with a scope was. On the outside of the wall, as you come out the door, are the other two long guns. So when Judge Peterson was making the finding of close proximity, that's what he was talking about, physical proximity, as well as the fact that temporal proximity. They were engaged in a 19-defendant drug conspiracy to distribute methamphetamine from California to Minnesota to Wisconsin. At one pound a week of methamphetamine, that was the drop-off point where people would come. Not only would Mr. Zeiss and Mr. Nelson sell the drugs, but this is a place where other co-conspirators that were moving weight would store their weight, pick it up, and then move on. So this was sort of the drug hub of the organization at the time that they were using. Was it that central? I mean, was this a stash house in a way? It was a stash house. It's on a 148-acre property in the middle of the Northwoods. It's the perfect place to have, if you're going to do an operation like this, that's the place to have. If you could wave your magic wand, that's what you'd want. Is it that many customers that knew in that place in the middle of the Northwoods? Merrill, Wisconsin, and Lincoln County is horribly affected right now by the methamphetamine crisis.  Now, understand, were these sentences below guidelines? Way below guidelines. I think one of the reasons they're harping on this, is it because they would be ineligible for some kind of a 12-month reduction in sentences because of the residual drug abuse program? You know, they were doing a preemption on a harmless error argument in their brief. We didn't argue harmless error because Judge Peterson didn't say the magic words that usually you want to see. I just wonder why they're making a big deal about the gun connection, because it does change something. Yeah, they're trying to show some kind of prejudice if there was error. Is it true that there's something else that would not be available because there was a gun involved? They do get RDAP, they just don't get the year off, Your Honor. So they still get RDAP training. RDAP, that's the word I didn't know. Residential drug abuse. Treatment. Yeah, so they are still eligible for that if they really believe they have an addiction and want to get better. They can do the program and try to get better. The question is that there's not the carrot that you get the one year off if you do it because of the gun. This is a carrot case. Well, again, we're not arguing harmless error, and the reason for the downward departure is there was 5Ks involved that we asked for, and with regards to Mr. Nelson, he also was forfeiting a large portion of that 148 acres. We took that under a forfeiture. Oh, okay. So I just want to touch on the ammunition argument that they're making, lack of ammunition. So Judge Peterson, when he was looking at this and they were trying to thread it into the hypothetical and say, okay, the hypothetical under Note 11 exists, and Judge Peterson correctly said, well, you've got unloaded hunting rifles, that's for sure, but they're not in the closet. They're in next to where all the drugs are stored and the cash. $20,000 a week is coming out of that place in cash. That's the problem. You can't meet the hypothetical. Then they tried to make these other arguments to him. Well, Andy Nelson was an avid hunter, and Judge Peterson correctly said, well, that doesn't mean that he can't also use the guns for tools of trade in the drug business. He's got a lot of motivation to do that because he's got a lot of drugs and a lot of money in that place. They said, well, he had no intent to ever hurt anybody. Judge correctly found it doesn't matter to me whether he wanted to hurt anybody or not. That's not a requirement to get 2D1.1. You don't get that. The government doesn't have to prove that. You don't have to prove intent. You just have to prove possession. Then they argued, well, if he really was going to use those, then when the police came and raided the place, he would have brought his guns up and had a shootout with the police. And the judge correctly said, again, that doesn't help. That's not a fact. That helps because it doesn't matter. There's a lot of people, a lot of drug dealers that use the tools of the trade, the weapon to protect their stash, but they're certainly not going to engage in a shootout with the police. So a lot of the facts that they were bringing up, these alternative facts that they were saying, well, he's right on the facts, but wrong on the law. He was discounting all these facts, saying those don't help. Those don't move you forward on your burden of proof where you have to meet it by a clearly improbable standard. Given the nature of where the drugs were found, the nature of the organization, how large it was, and what their roles were in it. And that's why he didn't err in saying, look, there's more than enough evidence to show a nexus, and you can't even get close to meeting your burden of proof. If the court doesn't have any other questions, I'll rest on Greece. Thank you. Thank you, Mr. Graber. Mr. Ruth, rebuttal? Thank you. Your Honor, from the government's argument, you would never know that there was no ammunition in the house. And that is the fact that changes everything. I concede that we lose under the note and under the case law if there is ammunition available. It's just a mere possession of the ammunition. Well, it's the lack of ammunition in the house. And honestly, this case reminds me of a situation we used to have in this circuit with respect to the question of if it was a violent felony or a crime of violence. We used to say that a walk away from the jail, failure to report to jail, was a violent felony. And it was a long argument to get there, but it was, well, maybe there would be a confrontation with the police when they arrested you after you walked away. Well, you know what? At some point, after Begay and new case law, that looked ridiculous. And that's what we have here. The government is saying, find that the guns were connected to the offense when there's no ammo. A gun without ammo is not a weapon. I've got to ask. You're out hunting. An angry landowner comes out with a gun. Do you know whether it's loaded or not? No, absolutely not. Okay, so why doesn't that rationale extend to this possible use of them? Well, two reasons. One is there's no evidence that anything like that ever happened. And two, you go back to the benchmark. The benchmark in the note is unloaded hunting rifle in a closet. There are possible ways that that could lead to violence, right? As an abstraction, can an unloaded gun be used in an armed robbery and can the conviction stand? I believe so. I think a toy gun, yes. And I think a toy gun can be used in an armed robbery. But the note is clear that toy guns don't count because of the definition of what a firearm is. So toy guns don't count. And, I mean, the bottom line is. But these weren't toys. They weren't toys. So give us your bottom line and thank you. Well, no ammo. That's the bottom line. Okay. And north. Read north. North says it all. I mean, if we had, if that case explains it all. And, Judge, I do want to correct you on something from the last argument. You said there's no money in horses. There's a lot of money in horses. The problem is it's only the money you put into them. Well, you just answered my reason. Thank you very much. Thanks to all counsel. All of the cases will be taken under advisement.